*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2020

**BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 1306
New York, New York 10007

    Re:   *United States v. Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

This letter is respectfully submitted in response to the Court's June 9, 2020, Order.

**Introduction**

Although we have not mastered every detail of the proceedings in this case, we believe we have a sufficient understanding of the events to provide the following answers to the Court.[1] We have addressed the issues here in depth because we wanted to understand as much as possible what happened here. We have identified and address below several points where mistakes were made. We do not believe any of the attorneys assigned to this case acted in bad faith or intentionally withheld exculpatory information.

For ease of reference, following are the attorneys who have been assigned to this matter since its inception:

**Line AUSAs**
Andrew DeFilippis: April 2017 through May 2019
Matthew Laroche: April 2017 through March 2019
Rebekah Donaleski: September 20, 2018 to March 4, 2019
Jane Kim: April 2019 to present
Michael Krouse: April 2019 to present
David Denton: June 19, 2019 to September 13, 2019

---

[1] We have spoken with all of the line prosecutors on the case, and almost all of the supervisors. All attorneys have been completely forthcoming with information and records. Any failure of detail or focus in this letter is solely to the inability of the undersigned to digest in the given time every item of all the information provided.

Stephanie Lake: September 2019 to April 2020 (continued to help on discrete tasks after that)

**Special Assistant U.S. Attorney**
Manhattan District Attorney's Office ("DANY") ADA Garrett Lynch[2]

**Supervisors**
John Cronan: April 2017 through August 2017
Sean Buckley: April 2017 through March 2018
Ilan Graff: August 2017 through September 20, 2019
Michael Ferrara: April 2018 through September 2019
Emil Bove: September 2019 through present
Shawn Crowley: September 2019 through present

**Question 1. (Potentially Improperly Withheld Material)**
*1. List all material in the case that was potentially improperly withheld from the defense.*
   *a. For each item responding to 1, indicate all Government attorneys who were responsible for the disclosure failures, including supervisors.*
   *b. For each item responding to 1, indicate whether the Government agrees or disagrees that the withholding of the item was intentional withholding of exculpatory evidence.*

With the exception of one category of still-classified information, the Government believes that all potentially disclosable material (and more) has been disclosed to the defendant.[3] In specific response to question 1.b, we do not believe that any information was improperly withheld from the defense, in the sense of knowing that it had to be disclosed yet not disclosing it. But many items were discovered or disclosed far too late, and the manner in which GX 411 was in fact disclosed was problematic. Following is a summary of the information that was potentially improperly withheld from the defense:

**GX 411**. We believe the key breakpoint here, which generated cascading negative consequences, was the absence of an indication, in ADA Lynch's January 10, 2020, email

---

[2] ADA Garrett Lynch was, at the time of the investigation, Deputy Bureau Chief of DANY's Major Economic Crimes Bureau. He was first appointed a Special Assistant U.S. Attorney ("SAUSA") in this matter effective June 7, 2017. His SAUSA appointment was renewed annually, and most recently expired on or about June 16, 2020. For simplicity, we will use Mr. Lynch's ADA title throughout this letter. The Court should be aware that when an attorney from another agency is appointed a SAUSA to assist this Office in a criminal case, it is this Office, and our AUSAs, who are ultimately responsible for disclosures in the case, and knowledge of any matter in the investigation that may be overlooked by a SAUSA is imputed to Government, whether or not the AUSAs on a case have actual knowledge of the matter. That being said, AUSAs on the case of course had multiple discussions about disclosure issues with ADA Lynch and he served as their principal source of information concerning conduct of the investigation by DANY.

[3] Some disclosures have been made via communications to the defendant that have not been filed on the docket.

transmitting the Commerzbank OFAC disclosure to the AUSAs in the case, that the document that eventually became GX 411 had been retrieved from a forgotten and just recently rediscovered DANY file. That would have triggered an immediate Rule 16 check. It is inevitable, particularly in a white collar or regulatory case, that a prosecutor may not recognize the potential exculpatory use to which a document may be put, but that is precisely where Rule 16 discovery can serve as a fail-safe. Had GX 411 been disclosed in January 2020, the defense could have then made clear its view of the document's exculpatory value, and the subsequent searches for communications with OFAC; for documents in DANY's and this Office's files from their earlier separate investigations of Commerzbank (discussed below); and for other materials whose disclosure was triggered by GX 411, could have taken place in an orderly fashion, as opposed to mid- and post-trial. Circumstances concerning the actual disclosure of GX 411 are discussed below. AUSAs Lake, Kim and Krouse, and ADA Lynch were the prosecutors aware of GX 411.

**Commerzbank**. Late disclosures from DANY's and SDNY's separate investigations of Commerzbank will be discussed below under GX 411.

**OFAC**. Triggered by issues raised after the disclosure of GX 411, the Government disclosed on March 9, 2020, (i) an August 1, 2016 email by ADA Lynch to a supervisor at OFAC in which Lynch said he would "like to coordinate with OFAC . . . to provide you with information so you can take action on your own if so desired," and (ii) a September 22, 2017 email by ADA Lynch to OFAC, copying AUSA Laroche, which attached a PowerPoint presentation outlining DANY's investigation and evidence against Sadr, and stating that the presentation "gives a rough sketch of the case, the players, and the evidence. Obviously, it's the tip of the iceberg – we're happy to share more information, records, etc." In addition, although communications between a prosecuting office and a regulatory agency are not generally disclosable as establishing that a regulatory agency knew of and approved certain matters, the Government made post-trial disclosures of other communications between the prosecution team and OFAC in 2017 and later. As indicated, ADA Lynch was the author of the August 1, 2016 and September 22, 2017 emails; AUSA Laroche was copied on the September 22, 2017 email; on on June 24, 2019, in an email string relating to a question by AUSA Denton about whether a formal license check had been run with OFAC, AUSA Laroche advised AUSAs Denton, Kim, and Krouse that "We had a few calls with Michael Dondarski at OFAC who is familiar with the case but I don't remember running license checks." AUSAs Lake, Kim, and Krouse became aware of the emails on March 9, 2020 when files were being specifically searched for communications with OFAC. Also, in late March 2019, ADA Lynch emailed AUSA DeFilippis to advise that he had spoken to someone at OFAC about a legal issue relevant to the defendant's pretrial motions and the Government's opposition, stating that the person at OFAC "[c]onfirmed the thoughts I had." (AUSA DeFilippis did not participate in the call.)

**Victor Aular Interviews**. The Government made post-trial disclosure of three FBI 302s of interviews (and related interview notes) of Victor Aular, a former CFO and Director of Petróleos de Venezuela, S.A. ("PDVSA"), the Venezuelan state-owned oil company. The interviews took place in February, March, and April 2016 in the presence of DANY personnel, including ADA Lynch. During the first interview Aular stated, in pertinent part, that he was aware of U.S. sanctions against Iran and that "this was the reason PDVSA contracts were reviewed by its attorneys" and

that "the attorneys who conducted the legal review would know more information about [Iranian International Housing Company]." According to Aular, the 302 continued, "PDVSA's payment situations were not routine. PDVSA's budget and principle currency was in US dollars. PDVSA's reporting was done in US dollars. PDVSA's payments to other countries were converted to each country's respective currency." During the second interview, Aular "indicated he was aware of some sanctions and the difficulties related thereto but explained that in his position he had very little knowledge of regulations and sanctions;" and that "he would always ask [PDVSA's] internal legal team to review contracts to ensure they were in order legally and that no violations were being committed." In addition, as set forth in the March 302, "AULAR noted that when discussing projects or proposals with Iran, the parties always spoke in terms of US dollars." In the third interview, Aular advised that "statements he gave during the previous interview [on March 11, 2016] were said in an inappropriate way and he wanted to clarify his position. AULAR clarified that Venezuela's relationship with Iranian enterprises was effectively a special relationship based on government to government agreements of great political importance." According to Aular, the 302 continues, "Iranian enterprises were aware of the impact sanctions were having on their ability to obtain US dollars. However, AULAR did not have this experience with Iranian enterprises. AULAR thought sanctions against Iran were publicly known. Iranian enterprises defined the structures they used in order to receive US dollars. AULAR received instructions from Iranian enterprises to make payments and he would proceed according to those instructions." Aular also clarified that, re-reading an August 31, 2011, document written on IIHC letterhead, "it was clear the IIHC's intention to avoid sanctions." [*sic*].

It is correct that no attorney on the case who was aware of the Aular 302s believed that a PDVSA legal review of the transactions at issue in this case would be exculpatory as to Sadr's state of mind, inasmuch as Sadr would have had no knowledge of this (supposed) legal review. Nor did any attorney on the case believe that the fact that Iranian transactions were always discussed in dollars (as opposed to Venezuelan bolivars, already a weakening currency), or that PDVSA's practice of accounting in dollars, was in any way exculpatory of transactions designed to avoid U.S. dollar sanctions. On January 30, 2020, in considering the first two Aular 302s, which ADA Lynch had emailed to AUSAs Krouse, Kim, and Lake on January 10, 2020, AUSA Krouse emailed AUSAs Kim and Lake to consider, "If [Aular] denied knowing Sadr,[4] do you think it's Brady we need to disclose." AUSA Lake responded, "I don't think he should have known Sadr, given their respective positions. But could be worth running by a chief." The AUSAs did not further pursue the question, but given the lack of any reason to think Aular should have known Sadr, there was no reason to consider Aular's lack of knowledge of Sadr as exculpatory of Sadr. But all that being said, even if not required to be disclosed, the Aular 302s should have been disclosed ahead of trial as a matter of good practice so that potential defense theories about Sadr's state of mind, however attenuated, and the admissibility of Aular's statements, could have been developed and addressed in an orderly fashion in limine.

---

[4] The February 302 reports that "AULAR had no dealings with people from the IIHC. AULAR only dealt with Ambassador SOLTANI and sometimes another member of Ambassador SOLTANI's office."

**Bahram Karimi Interviews**. There was no delay in disclosing Karimi interview material in the possession of the prosecutors. However, there were two failures of communication between the FBI and the prosecutors on the case in this area. The first related to a classified FD-1057 report of an interview with Karimi on September 14, 2016. Early on in the case—which was taken in by our Office in approximately April 2017—AUSA Laroche had multiple conversations and meetings with the FBI Special Agents on the case (including in-person meetings on April 10 and May 15, 2017) during which they discussed, among other things, the fact that classified information could be discoverable, including classified information in the FBI's file, and the need to conduct a prudential search for potentially discoverable classified information in the possession of intelligence agencies, which once conducted in August 2017 ultimately indicated no potentially disclosable classified information in those agencies' files. Moreover, on May 31, 2017, at AUSA Laroche's request, ADA Lynch sent AUSAs Laroche and DeFilippis an email, copying the FBI Special Agents on the case, in which ADA Lynch sent personal identifying information for Karimi, among others, and identified him as an individual for whom the case team would need to search for classified information. After the case was charged, AUSA Laroche also identified in an email to one of the FBI Special Agents, ADA Lynch, and AUSA DeFilippis the categories of discovery to be produced and later in October 2018 in connection with the Government's response to a letter from defense counsel, AUSA Laroche emailed the case team about confirming that SDNY had all copies of FBI 302s or other documents reflecting witness interviews. But not until mid-May 2020, when AUSA Krouse communicated with the FBI and (on May 18) conducted an on-site personal review of the FBI case file, did the prosecutors learn of the FD-1057 Karimi report. This led to identification (and speedy declassification and disclosure) on May 19, 2020 of the originally classified report. The second failure of communication related to the transmission and receipt of the recording made by Canadian authorities of the January 22, 2020, interview of Karimi. All of the trial prosecutors then-assigned to the case knew of the recording at or shortly after the time it was made, and its existence and efforts to obtain it were discussed on the record; but no prosecutor knew that the FBI in New York had in fact received the recording on or about February 12, 2020, until after the trial, on or about March 30, 2020. The circumstances regarding the Karimi recording are laid out in the Government's letter of April 13, 2020. (Dkt. No. 307).

**Other Classified Material**. During its post-trial review, the trial AUSAs discovered another item of classified material that would be subject to Rule 16 disclosure. This item has not been declassified. Given the Government's request for a *nolle prosequi*, declassification in connection with this case is not likely to occur because components of the United States Government involved in the handling of the classified information would be unlikely to authorize use of the information in the absence of an active criminal prosecution with attendant Rule 16 obligations. (The Government has previously advised the defense of the foregoing.)

**Suppression**. The defendant's post-trial motions include a motion to reconsider the Court's partial denial of their motion to suppress email evidence. On February 20, 2020, the FBI sent to AUSAs Krouse, Kim, and Lake and ADA Lynch an email referencing a June 7, 2016 FBI FD-1057 relating to Farshid Kazerani (who testified as a Government witness at trial). Noting that the report was classified, the FBI email did not attach the report, but described it as "from when our Seattle office made contact with Kazerani in Seattle to notify him that FBI New York was trying

to get in contact with him," and that "Kazerani's statement acknowledged the request, his current school and work situation and his contact information." Following trial, in connection with his search for classified information, discussed above, AUSA Krouse requested that report which, together with other previously classified information, was produced to the defense on May 19, 2020, under Bates No. USAO_00509-00527). This and other reports obtained around this time suggested that, early on in the DANY investigation, the FBI had had DANY personnel search email data in general support of at least one witness interview, and that the FBI was investigating federal crimes rather than the state-law offenses at issue in the warrants, contrary to arguments we made during suppression litigation. Subsequently (on June 1, 2020), and consistent with the indication in the FD-1057 Report, ADA Lynch provided a series of email threads relating to the manner in which DANY conducted its searches of email accounts pursuant to the state warrants, including a 2016 email in which the then-case agent asked DANY personnel if they could pull photographs from the provider data obtained pursuant to the state warrants for use in a witness interview. These emails were produced to the defense on June 5, 2020, together with a number of other documents.

**Other Disclosures**. Given the disclosure issues that surfaced during and after trial, the Government made a point of disclosing other interview and documentary material that we believe went beyond the Government's disclosure obligations and that are not directly pertinent to the Court's questions here.

**Question 2. (Karimi *Nolle*)**
*2. Identify with specificity the "disclosure-related issues that arose during the March 2020 trial as well as in pre- and post-trial motion practice, including with respect to the pretrial suppression litigation," Dkt No. 348, that are the basis for the Government seeking to nolle the indictment against Mr. Karimi, who has not yet been tried.*

Were Karimi ever to be taken into custody and arraigned on the indictment against him, he will not have been prejudiced by the timing of any of the disclosures in the Sadr case. Nor (with the crucial exception of the suppression issues addressed immediately below) do we view the substance of any of the late disclosures in the Sadr case as particularly undercutting the strength of the case against Karimi on the sanctions-related charges.[5] Instead, the principal factors that have led us to submit a *nolle prosequi* in the case against Karimi are as follows.

---

[5] Karimi was also charged in Count Three of S2 18 Cr. 224 with making a false statement in January 2020 that "during the course of the Venezuela Project, KARIMI believed that international sanctions against Iran did not apply to Iranian companies or persons." Among the post-trial disclosures to Sadr was a recently declassified October 6, 2016, FBI FD-1057, concerning a September 14, 2016, conversation between Karimi and an FBI agent. That report noted, among other things, that Karimi "stated aloud neither he [n]or anyone else broke any laws." ADA Lynch (who had not been present at this) sent an email that same day relaying his impression from the law enforcement participants that Karimi "firmly believes he and others did nothing wrong." (Dkt. 341, Ex. B at 3; Ex. C at 2). At a trial on Count Three, Karimi could conceivably offer one or both of those documents as prior statements consistent with an innocent state of mind at the time of the false statement charged.

The Honorable Alison J. Nathan  Page 7
July 2, 2020

First, as previously referenced, among the post-trial disclosures in the Sadr case was an FBI report and email communication between FBI agents and DANY personnel that provide a basis for the defense to argue that the FBI was seeking to use material gathered in response to the state email search warrants in aid of FBI interviews, and to further investigation of federal charges. We viewed these items as likely to lead to an expansion of the suppression issues in the case and to a substantial risk that essential email evidence would be suppressed. As the Court is aware, there were already significant difficulties in reconstructing the manner in which the state search warrants were executed. And, while we are not at this moment aware of any additional information that would have to be disclosed in this regard, given the late disclosures here, and the difficulties in reconstructing every detail of the investigation conducted by the FBI and DANY before this Office took over the case, we cannot discount the possibility that additional information supporting a motion to suppress might be identified. This was a significant reason, going to the underlying strength of our admissible evidence, which led us to believe that a *nolle prosequi* was appropriate.

The second main reason was a resource and timing issue. Any new trial would necessarily require a new team of AUSAs who would have to become familiar with every aspect of the investigation—not an easy task, particularly in a case that has already suffered from multiple breakdowns in communication that contributed to significant disclosure failures. Moreover, Karimi lives in Canada and could easily flee to Iran, from which he could not be extradited. We would not expect to take Karimi into custody any time soon (if ever), and in our decision to request entry of a *nolle prosequi* we considered that, over time, loss of memory and increased difficulties in accessing information would make it more difficult for a new team of prosecutors to absorb everything they would need to know about the investigation in the case. We also considered other, more speculative, potential issues in a future trial, such as efforts to impeach the investigation or individual agents based, for example, on the circumstances and differing recollections of the late production of the Karimi recording.

Finally, and not least, the indictment against Karimi alleges that he participated in the charged conduct as part of his employment for a company that was controlled by Sadr and his family. (*See* Dkt. 199). For this and other reasons, we assessed Karimi to be a lesser contributor to the charged conspiracy than Sadr. Once we had concluded that disclosure-related issues warranted dismissal of the Sadr indictment, the potential unfairness of proceeding only against Karimi was a further factor supporting dismissal of the Karimi Indictment.

**Questions 3-5 (GX 411)**
*3. Identify all Government lawyers, including supervisors, who were involved in the decision to transmit GX 411 to the defense during trial without expressly indicating that it had not previously been disclosed. See Dkt. No. 279-1 at 3.*

Please see the narrative under question 5.

*4. In an order dated March 8, 2020, the Court required, among other things, the Government to "explain precisely when and how it realized that [GX 411] had erroneously been withheld and when, if at all, upon learning of the failure to disclose this was communicated to the defense." Dkt. No. 290. In its response letter, the Government explained that "members of the team discussed the document . . . and confirmed that it likely had not been produced to the defense previously. The*

*Government promptly had a paralegal mark it as an exhibit and produced it to the defense along with other exhibits and 3500 material. The <u>Government made clear that GX 411 was a newly marked exhibit</u> and that we intended to offer it . . . ."* Dkt. No. 277 (emphasis added). *In Court the next day, the Government conceded that this was false. See Trial Tr. at 993:24–994:2 (Court: "When this was disclosed to the defense Saturday around 4:00, did you identify it as a newly-marked document?" AUSA: "No."). In a letter dated March 9, 2020, "the Government reiterate[d] its earlier concessions of error in failing to timely produce GX 411, and failing to make accurate disclosures regarding the status of the document on March 7 and March 8, 2020."* Dkt. No. 283 at 1 (emphasis added).

> *a. In light of how GX 411 was actually transmitted to the defense, was it false and/or misleading to state to the Court that "[t]he Government made clear that GX 411 was a newly marked exhibit"?*
>
> *b. Name all Government lawyers, including supervisors, who were involved in making that representation to the Court.*

Please see the narrative under question 5.

*5. Do the disclosures made by the Government after trial on May 21, 2020, discussed in Dkt 341 at 7–9, cast doubt on any representations made to the Court, including in the March 9, 2020 letter, about the prosecutions team's awareness of the contents of GX 411?*

*Name all Government lawyers, including supervisors, responsible for any misstatements made to the Court.*

We have looked at issues concerning GX 411 very closely. The Government disclosed GX 411 within one day after realizing it had not been previously disclosed; and we do not believe any of the attorneys on the case recognized *any* exculpatory value of this exhibit to the defense until the defense itself raised the issue. We set forth our analysis, and have attempted to respond to the Court's specific questions, in the discussion below. We start first with the Commerzbank investigations, the source of GX 411 (and of other subsequently disclosed documents).

**The Commerzbank Investigations**. Prior to initiation of the Sadr investigation, DANY and this Office (in conjunction with other federal components) each had investigations into Commerzbank. The federal and state investigations were resolved via a deferred prosecution agreement entered into on March 11, 2015, and announced on March 12, 2015. In brief, as set forth in this Office's press release of March 12, 2015, the federal investigation involved violations of the International Emergency Economic Powers Act and the Bank Secrecy Act, particularly in connection with Commerzbank's role in facilitating transactions related to an accounting fraud by Olympus Corporation; and Commerzbank's role in processing, from 2001 through at least 2008, $263 million of transactions that were prohibited under U.S. law. In its press release issued on March 12, DANY also announced the settlement, describing the conduct in part as "beginning in or around January 2002 and continuing through 2008, Commerzbank systematically violated both New York State and U.S. laws by moving hundreds of millions of dollars illegally through banks in Manhattan primarily on behalf of Iranian and Sudanese clients subject to U.S. sanctions." The specific banking transactions listed in the Indictment in this case run from 2010 through 2013.

Even in retrospect, it appears that, absent knowing some specific reason to look, the DANY and SDNY Commerzbank investigative files would not be considered as files that should have automatically been searched for matters to be disclosed in this case. And in fact, the AUSAs assigned to this case had no knowledge of the Commerzbank investigations until the events of this year. As discussed below, there was a specific reason to look in these files, but that reason was overlooked and did not resurface until mid-trial.

**The Commerzbank-Venezuela Housing Documents**. ADA Lynch was one of the DANY attorneys assigned to DANY's Commerzbank investigation. In approximately June 2015, ADA Lynch was also assigned to the Venezuela housing matter, which ultimately led to this case. At some time around June 2015 or later that year, as ADA Lynch was boxing up material from the Commerzbank investigation that had ended on March 12 of that year, ADA Lynch came across some documents (including or consisting of the Commerzbank Stratus International disclosure to OFAC) that he realized related to the Venezuela housing matter. He set those documents aside in a hard-copy manila folder. Thereafter, on August 31, 2015, ADA Lynch issued a state grand jury subpoena to Commerzbank for wire transfer information, for the period 2010 to date, concerning a list of institutions, including for example Stratus International Contracting J.S., pertinent to the Venezuela housing investigation. Commerzbank duly responded to that subpoena. When this Office took over the investigation in around April 2017, the returns from the Commerzbank grand jury subpoena were provided to our Office and were duly disclosed. But the folder of documents that ADA Lynch had set aside from the Commerzbank investigation had, by then, been lost to ADA Lynch's memory, and was not relayed to our Office. Had it been its contents would certainly have been disclosed as a matter of course under Rule 16 and subsequent events would have turned out much differently.

**DANY's Transmission of the Commerzbank OFAC Disclosure (GX 411) to SDNY.** ADA Lynch advises that in making a pre-trial sweep through his office for everything he rediscovered the separate folder of Commerzbank-Sadr documents. This would have been around December 2019—ADA Lynch advises that, in a December 19 email to AUSA Kim, copied to the other AUSAs on the case, concerning U-turn transactions over SWIFT, the following comment, which he added to the email, relates to GX 411: "(Now I'm really going off on a tangent, but Commerzbank was an intermediary bank in the first USD payment (to Stratus Turkey) and they actually picked up on 'Stratus' in the payment message, drew the connection to the Iranian entity, and filed a report with OFAC.)" ADA Lynch emailed the actual Commerzbank OFAC disclosure to AUSA Lake, with other team members copied, on January 10, 2020. In that email he noted, "In the spirit of closing the loop on the $29M payment through Commerz, attached is the voluntary disclosure Commerze made to OFAC re: the payment." The document, and the potential need for a witness from Commerzbank to authenticate it, were further discussed in emails between ADA Lynch and the AUSAs on the case on January 30 and February 1, 2020. But there was absolutely nothing in these exchanges to suggest to the trial AUSAs that the Commerzbank OFAC disclosure came from any source other than the Commerzbank grand jury returns, which had been disclosed; there was nothing to suggest that there was some other, forgotten and rediscovered, set of Commerzbank documents relevant to the Venezuela housing investigation that had not been

disclosed.[6] And on the then reasonable assumption (by the AUSAs on the case) that all Commerzbank documents had previously been disclosed, there would be no call at this time for a disclosure analysis under either Rule 16 or as exculpatory information. Nor did any of the attorneys view this document as anything but further inculpatory proof of one of the transactions at issue. Had any of the attorneys on the case recognized the exculpatory theory the defense has articulated, that would, we believe, have triggered further analysis, but they did not. The Court has referred to that as "trial blinders," which is an apt description, and which is why other mechanisms for ensuring full disclosure are so important, to cover defense theories that prosecutors on a case simply do not see.

**The Decision to Use GX 411**. At around 7:49 and 7:52 p.m. on the evening of Friday, March 6, 2020, in the middle of trial, AUSA Lake emailed ADA Lynch, copying the other AUSAs on the team, regarding the Commerzbank OFAC disclosure: "I'm cleaning up email and came upon this. Given what defense did today, I think this could be really valuable to put in. Among other difficulties with doing that is the fact that I don't know that it was ever produced to defense (it's not in the Commerzbank subpoena production). Garrett – do you know where it came from?" It appears that AUSA Lake tried to call ADA Lynch at this time, but was unable to connect with him at this moment. AUSA Lake then initiated an exchange with AUSA Kim, at 7:53 p.m. Friday evening, on an internal chat system. (AUSA Kim was at this time primarily working on the Government's rebuttal summation.) In the chat, AUSA Lake noted, "i feel like it might be too late to do anything about it, but i can't believe we all missed that commerzbank document," adding "i have no idea where that letter came from[;] i don't think it has ever been produced to the defense".

---

[6] ADA Lynch advised us today that he recalls discussing the Commerzbank OFAC disclosure with AUSAs in January 2020, and that at or about that time, he had a telephone conversation with AUSA Lake about, among other things, "how and from where" the Commerzbank OFAC disclosure had been obtained. AUSA Lake (as well as AUSAs Kim and Krouse) have confirmed that they did <u>not</u> have a conversation with ADA Lynch at that time about how and from where the Commerzbank document had been obtained. We were surprised to learn of ADA Lynch's recollection, which was not mentioned in earlier proceedings. For example, ADA Lynch was in court on March 9, 2020, when AUSA Krouse stated that ADA Lynch "hasn't flagged it as something new, he flagged it as this is another piece of evidence." (Tr. 980). The Government's March 9, 2020, letter (docket entry 283), a draft of which had been sent to ADA Lynch, states:

> AUSA Lake recalls speaking to SAUSA Lynch on the phone briefly about GX 411 soon after SAUSA Lynch sent his January 10, 2020 email. SAUSA Lynch recalls that he and AUSA Lake discussed the substance of GX 411 and whether to introduce it in the Government's case-in-chief. At the time of the January 10, 2020 email, AUSAs Lake, Kim, Krouse, and SAUSA Lynch did not realize GX 411 had not been produced in Rule 16 discovery, and failed to check whether it had been.

It would have been pertinent for a January 2020 discussion of the provenance of GX 411 document to have been raised at the time of those representations on March 9. It remains our evaluation that the Commerzbank OFAC disclosure was not identified as coming from a completely new source at the time it was transmitted to our Office in January 2020.

The Honorable Alison J. Nathan                                                                                Page 11
July 2, 2020

Following some initial confusion on the part of AUSA Kim about what document was being discussed, AUSA Kim responded, "oh, that letter[;] we can produce it tonight[;] produce it right now and the defense can have 3 days to review[;] that's more than enough time for one document[;] mark and produce it stat - i think we should at least try". AUSA Lake responded, "i'm wondering if we should wait until tomorrow and bury it in some other documents", to which AUSA Kim responded, "that's fine too - some of the FATF[7] stuff". "Bury," of course, is a trigger word in the context of disclosure, and that is one of the reasons we have scrutinized the production of GX 411 so closely. But the document, which was in fact produced less than 24 hours later, was not buried. While AUSA Lake is endlessly chagrined about this chat, we believe it would go too far to condemn her for a Friday night lapse in thinking regarding a document that was in fact disclosed Saturday afternoon. Returning to the events of that evening, AUSA Lake had a conversation with ADA Lynch at this time, and resumed the exchange with AUSA Kim at 8:05 p.m., communicating that ADA Lynch was reaching out to a contact at Commerzbank to get a witness for Monday. AUSA Lake noted the "need to come up with some explanation for why the defense is just seeing this for the first time, though[;] apparently DANY got it through an unrelated case. AUSA Kim asked, "how- through subpoena?," to which AUSA Lake responded, "he thinks it was through a DPA with Commerzbank." AUSA Kim responded, "ahhh[;] was he involved w that?", to which AUSA Lake responded, "unclear", after which she said she was stepping away and the chat ended.[8]

The following morning, AUSA Lake called AUSA Krouse, who was at home working on his summation. AUSA Lake then conferenced in AUSA Kim. Summarizing the AUSAs' recollections of this call: AUSA Lake discussed the document, where it came from, and how it was helpful because it showed that the information the defendant was trying to hide from the bank was material to the bank, which wouldn't have processed the transaction if it knew it was connected to Iran, and that the bank put the name of the company on its sanctions filter. The AUSAs discussed the fact that the document likely had not been produced to the defense previously. Whether the exhibit was worth offering was discussed, with AUSA Lake stating that she thought it was good and worth offering, and would get it marked. On the other hand, AUSA Lake did not want to get into a fight with defense counsel over the document. Rule 16 was also discussed, and the possibility of a defense objection under Rule 16. AUSA Lake recalls a discussion that GX 411 might not violate Rule 16, because it was only being offered in response to issues raised by the defense. AUSA Kim advises that she does not recall any discussion about not highlighting GX 411 to the defense on the call; rather, that the AUSAs agreed that GX 411 was inculpatory, should be produced to the defense as soon as possible, and to try to offer it into evidence the following week. AUSA Krouse does not recall any discussion during this call of the manner in which GX 411 should be disclosed to the defense. As to all AUSAs, there was never any notion that GX 411 might be of exculpatory value to the defense.

---

[7] In this regard, AUSA Kim has explained that she thought it would be fine to disclose GX 411 the next day together with a newly-marked Financial Action Task Force exhibit (that the prosecutors ultimately decided not to use).

[8] AUSA Krouse advises he first became aware of this chat last week, during this review process.

The Honorable Alison J. Nathan                                                                                                  Page 12
July 2, 2020

   Shortly after that call, at 10:48 a.m. that Saturday, AUSA Lake emailed the document to a paralegal and asked him to mark it; the paralegal was not immediately available and this occasioned some delay (which led AUSA Kim to suggest to AUSA Lake that it should be sent out the door without waiting for it to be marked). The document was finally emailed to the defense at 4:04 p.m. that afternoon, under cover of the email quoted below. AUSA Lake has a recollection of discussing with AUSA Krouse whether to flag in the email that GX 411 had not previously been produced. She cannot remember the discussion in detail but her takeaway was that they were both confident the defense would know it was a new document given their knowledge of the case, that the Government should simply produce it and wait for the defense's questions, and if the Government did not make a big deal about the document, the defense might decide that it was not important enough to object. AUSA Krouse, who was concentrating on the summation that weekend, does not recall being consulted about the transmittal email or seeing it before it was sent, and believes he would remember any discussion about how the item should be produced had he participated in one. AUSA Kim has also advised that she did not participate in drafting or reviewing this email prior to its transmittal.

   Following is the transmittal email AUSA Lake sent at 4:04 p.m. Saturday afternoon:[9]

> **From:** Lake, Stephanie (USANYS)
> **Sent:** Saturday, March 07, 2020 4:04 PM
> **To:** Weingarten, Reid <RWeingarten@steptoe.com>; Heberlig, Brian <BHeberlig@steptoe.com>; Silverman, Nicholas <nsilverman@steptoe.com>
> **Cc:** Krouse, Michael (USANYS) <MKrouse@usa.doj.gov>; Kim, Jane (USANYS) 4 <JKim4@usa.doj.gov>; Lynch, Garrett (USANYS) [Contractor] <GLynch@usa.doj.gov>; Milione, Shawn (USANYS) [Contractor] <SMilione@usa.doj.gov>
> **Subject:** U.S. v. Sadr
>
> Counsel,
>
> Mr. Dubowitz is still very ill. As a result, we do not intend to call him as a witness in our case-in-chief. It's possible that, depending on the defense case, we will call him as a rebuttal witness.
>
> In addition, we've attached the following documents:
>
> - Updated GX 2284D – there were formatting problems with our version. We think the attached corrects them.
> - 3508-08 – 3500 from today
> - GX 411 – we intend to offer this on Monday. Let us know if you will stipulate to authenticity.

---

[9] Due to a transmission error, the production had to be retransmitted at approximately 4:24 that afternoon.

The Honorable Alison J. Nathan                                                                                                Page 13
July 2, 2020

- GX 456 – we intend to offer this on Monday. Let us know if you will stipulate to authenticity.
- GX 495A & B – we intend to offer these on Monday (likely in redacted form), although think a stipulation that the defendant had bank accounts at HSBC from January 2010 through October 2013 might be simpler. Let us know how you prefer to proceed.
- GX 704 – this is the modified version of the travel chart. Please confirm whether you have any remaining concerns.
- GX 705A & B – these are summary charts reflecting the information in GX 2090A. Please confirm whether you have any objections.
- Updated GX 2304A – we enlarged some of the cells, as the formatting of the PDFd excel file was cutting off some of the data. The content is the same.
- 3504-10 – Peri 3500, which was provided in hard copy yesterday morning.
- 3505-06 – Blair 3500, which was provided in hard copy yesterday morning.
- 3513-02 – Paralegal 3500 for summary chart (you may already have this)
- 3513-03 – Paralegal 3500 for summary chart (you may already have this)

We are still working on one additional summary chart, which we expect to provide later today.

This email does not, as we believe it should have, identify GX 411 as a new document that was not previously produced. But neither was this transmission of GX 411, together with 14 other documents (mostly duplicates of 3500 material or revisions of exhibits), a burial. Rather, it was completely justified to assume and expect that defense counsel here, highly attuned to the case, would immediately recognize GX 411 as a new document and inquire about it. As they did: at 4:57 that afternoon, Mr. Heberlig responded to the above email, stating, in here pertinent part, "We request immediate disclosure of (1) where GX 411 came from, (2) how long it has been in the government's possession, (3) why we are only receiving it today. This is the second episode—along with GX430, GX431, and GX432—of the government producing fundamentally exculpatory documents mid-trial." As we have indicated above, it remains our evaluation that AUSAs Lake and Kim recognized GX 411 as a Rule 16 issue on the evening of Friday, March 6, 2020, and ensured that it was produced the following day, but that no attorney on the case had any inkling until Mr. Heberlig's Saturday afternoon email that GX 411 would have exculpatory value for the defense.

**The Government's March 8, 2020, 10:00 p.m., Letter**. Turning now to the question of the extent to which the Government "made clear that GX 411 was a newly marked exhibit." The Court's question relates to the Government's letter of Sunday, March 8, 2020, filed at approximately 10:00 p.m. that night under docket entry 277. By way of background, earlier that day, at approximately 3:20 p.m., the defense filed a letter informing the Court of the disclosure of GX 411 and requesting a curative instruction. (Dkt. No. 274). At 4:04 p.m., the Court issued an order directing the Government to respond to the defense request by 7:00 p.m.; and at 5:01 p.m., the Court issued a supplemental order directing that "In its response letter to be filed at 7 p.m., the Government shall include a detailed representation to the Court that explains why Government

Exhibit 411 was not previously disclosed and what led to its disclosure for the first time yesterday. That representation should further specify all attorneys involved in the decision-making with respect to both the non-disclosure and the subsequent disclosure yesterday of this document." AUSA Lake prepared and circulated a draft letter and filed the Government's response at approximately 7:00 p.m. Thereafter, at approximately 9:05 p.m. that evening, the Court issued an Order (docket entry 290) which stated in pertinent part:

> In the letter filed this evening by the Government, Dkt. No. 275, the Government states that "It was only in the context of this process that the Government realized that GX 411 was not part of Bank-1's subpoena production, which had been provided to the defense in discovery."
>
> The Court requires further explanation. Specifically, it is unclear from this sentence if the Government realized GX 411 had not been previously disclosed before or after the Government turned it over to the defense yesterday. Nor does this sentence indicate if, upon learning of the late disclosure, the Government informed defense counsel or not. The Government shall explain precisely when and how it realized that the document had erroneously been withheld and when, if at all, upon learning of the failure to disclose this was communicated to the defense.

The Government was ordered to respond by 10:00 p.m. AUSA Kim forwarded the order to Chiefs Bove and Crowley, who responded to all the line prosecutors at 9:22 that "We're around to turn the draft." At 9:31 that evening, AUSA Lake circulated to AUSAs Kim and Krouse, and ADA Lynch, a draft response which read in pertinent part as follows (emphasis added):

> The Government found GX 411 in its emails on Friday night, looked at the Commerzbank subpoena production, and did not find it. The members of the team discussed the document the next morning and confirmed that it likely had not been produced to the defense previously. The Government had a paralegal stamp it later in the day, and produced it to the defense. **The Government did not specifically identify that GX 411 had not previously been produced in discovery.** Defense counsel responded shortly after the Government provided GX 411 and asked how long the Government had GX 411, and why they had not previously received it. The Government responded and explained that we had been aware of the letter since mid-January, and had mistakenly believed that it was part of the discovery in the case.

Unfortunately, AUSA Lake, who was ill, had to leave the Office shortly after sending the email.[10] She let AUSA Krouse know. At 9:50 p.m., AUSA Krause realized that AUSA Lake's email had only been sent to the trial team and not to the Unit Chiefs. AUSA Krouse forwarded AUSA Lake's email and her draft to Chiefs Crowley and Bove, copying AUSAs Kim and Lake, with the comment, "Not sure Stephanie sent this to you." At 9:53 p.m., Chiefs Crowley and Bove called

---

[10] We have provided further information on AUSA Lake's medical condition in a separate letter filed under seal.

AUSA Krouse. Mobile phone records indicate this call lasted until 9:59 p.m., one minute before the Court's deadline. AUSAs Crowley and Bove were out of the Office at this time, communicating by iPhone, and were not able to review the final draft. At 10:01 p.m., AUSA Krouse emailed to AUSA Kim, "They called me with some changes. I made them and filed."

The letter that was actually filed differed from AUSA Lake's draft, principally in the absence of the bolded sentence above and the insertion of the bolded sentence below. In pertinent part the letter as filed stated:

> The Government found GX 411 in its emails on Friday night, looked at the Bank-1 subpoena production, and did not find it. The members of the team discussed the document the next morning and confirmed that it likely had not been produced to the defense previously. The Government promptly had a paralegal mark it as an exhibit and produced it to the defense along with other exhibits and 3500 materials. **The Government made clear that GX 411 was a newly marked exhibit** and that we intended to offer it, and asked the defense if they would stipulate to authenticity.

Recollections at this point diverge. Chiefs Crowley and Bove have advised that they did not request these changes, although they may have missed the changes if the final draft was read to them over the phone. (Indeed, contributing to the confusion, Chiefs Crowley and Bove have advised that it was not until after this inquiry had begun that they realized the letter that had been filed differed from the draft that AUSA Lake had prepared.) On the other hand, AUSA Krouse recalls opening AUSA Lake's draft during the call and making changes that he understood to reflect the input he was receiving from the unit chiefs. In retrospect, it is our evaluation that the review process that took place in the seven minutes before the filing deadline ended with a failure of understanding. As a result, AUSA Krouse filed a letter that he believed reflected the considered judgment of his supervisors. AUSA Lake continued to be unwell the next day. AUSA Krouse and Chief Bove spoke for the Government in court about the shortcomings of the letter, including that the letter failed to respond to the Court's question, which they recognized that morning. In sum, we do not see any indication of any intent to mislead the Court here; rather, we think there was a last-minute effort Sunday night to get things right that unfortunately ended up getting things wrong.

**Question 6. (Known Misstatements)**
*6. Identify all known misstatements (in writing or orally) made to the Court about disclosure issues in this case.*

We have not in the time given been able to scour the record for every statement made to the Court that might have needed correction or elaboration. As a general matter, it is our understanding that all statements the Government may have made to the Court at various times regarding the status or completeness of disclosures have been corrected, as need be, by the series of mid-and post-trial disclosure letters (including to an extent this letter) filed with the Court. (Some items were updated in correspondence with defense counsel that has not been filed.) Beyond such

statements regarding the status and completeness of discovery, following are the principal areas where our understanding of circumstances, and representations to the Court, needed correction.

**Classified Information**. At a May 16, 2018, court conference, the Court asked the government "if there's going to be any sort of classified information or anything like that," so that the Court could prepare for handling any classified discovery matters. (Dkt. 32 at 18). Based on the prudential search review he had conducted with ADA Lynch, and several conversations with the FBI agents assigned to the investigation, AUSA Laroche responded: "We do not anticipate any classified discovery or any [Classified Information Procedures Act] litigation in this case." AUSA Laroche's evaluation has in fact proven to be correct; we note this exchange because at the time AUSA Laroche was unaware of the classified material in the FBI's case file despite having inquired on multiple occasions as to whether such material existed, as discussed above. Also, as noted elsewhere, there remains one item of classified information that has not been declassified.

**Karimi Interviews**. During the March 10, 2020, charging conference (*see* Tr. 1354-56), AUSA Kim stated, in sum, that "the squad supervisor again reached out and asked again for the recordings. Again, my understanding is that this process isn't immediate, that a foreign government or foreign law enforcement agent typically doesn't produce this type of material immediately. And so I just want to make clear for the record that we have produced all of our underlying notes and materials in connection with those interviews." This reflected AUSA Kim's understanding of the circumstances at that time. But after trial, on March 30, 2020, the Government learned that the FBI in New York had in fact received the recording on February 12, 2020. The Government advised the Court by letter of March 31 (Docket. 303), and provided additional detail concerning production of the recording via a set of declarations that it provided to defense counsel on June 5. (These declarations have not been filed.) In addition, on May 18, 2020, during his review of the FBI case file, AUSA Krouse discovered the previously classified FBI FD-1057 report relating to the September 14, 2016 Karimi interview discussed above. The report was quickly declassified and produced to the defense on May 19, 2020.

**Suppression Matters**. Although we at this moment have not identified a specific example of a representation to the Court on the subject, one overall theme of the Government's argument on the suppression motions was that DANY personnel reviewing the returns on the various state email search warrants were conducting the review looking for material pertinent to the state law violations referenced in the warrants. The Government was somewhat more specific on this point in representations to the defense at the time, indicating, in sum, that the email search warrant returns had been reviewed by DANY personnel and that after the DANY review had ended, in June or July 2017, "hot docs" were provided to the U.S. Attorney's Office. *See* Government letter of September 26, 2019, Docket No. 147-3. These representations were based in substantial part on information provided by ADA Lynch. But as discussed above, recently identified email correspondence involving FBI personnel in 2015 and 2016 suggests a greater involvement of FBI personnel during the state responsiveness review. Were the Government to continue to litigate this matter, FBI involvement during the state responsiveness review would have to be carefully investigated in order to provide the Court with a thorough new statement of the circumstances of the searches.

**GX 411**. The Government's principal representations concerning the discovery and disclosure of GX 411, and how clearly the Government did—or did not—identify GX 411 as a new document,

are contained in the March 9, 2020, transcript at Tr. 976-95. Our analysis of exactly what happened in this regard is set forth above.

**Question 7. (AUSA Training)**
*7. Following a conceded Brady violation in another case before this Court in United States v. Pizarro, No. 17-cr-151, the leadership in the United States Attorney's Office assured the Court that significant new training on disclosure issues was being systematically instituted in the Office in order to prevent a similar issue from recurring. Did all AUSAs in this matter, including the Special AUSA (SAUSA) assigned from the District Attorney of New York (DANY), receive the newly-instituted training?*

Following (and substantially as a result of) issues in the *Pizarro* case, this Office, under the leadership of then-Chief Counsel Audrey Strauss, and at the direction of U.S. Attorney Geoffrey Berman, convened a committee that by September 2018 had completely updated our Discovery and Disclosure Policy. The Policy stresses, among other things, how "[b]road, early disclosure is also in the prosecution's interest because it will leave the prosecutor less likely to be vulnerable after the case is over to the argument that a non-disclosure that seemed immaterial early in the case was in fact material at the end of the day." We also addressed our prosecution memo template to call for specific discussion of anticipated discovery issues and any particularly challenging anticipated defense. AUSAs received Unit-level training on the Policy shortly after its adoption. All AUSAs assigned to this case, but not ADA Lynch,[11] received this Unit-level training.

The revised Policy was well received and we believe it has led, among other things, to earlier identification and discussion of items that might, even arguably, support an exculpatory argument, and to earlier disclosure of witness statements (including non-testifying witnesses). Although the Sadr case was accepted by the Office in April 2017, discussed in a December 2017 prosecution memo, and indicted in March 2018—all of which preceded the post-*Pizarro* changes—the AUSAs who initially took over the case worked diligently and in line with the post-*Pizarro* changes to comply with their disclosure obligations. This included, prior to charging and among other things, (i) multiple in-person visits to DANY during which the AUSAs reviewed DANY's electronic case file, discussed the investigation and potential discovery and suppression issues, and stressed the need to disclose any potentially exculpatory materials; (ii) multiple other meetings and phone calls with DANY and/or the FBI, including the case agents and, at times their supervisor, during which the AUSAs discussed the investigation and evidence, requested materials, and stressed, again, the need to disclose potentially exculpatory materials; (iii) the AUSAs requesting an itemized list of all evidence obtained as part of the investigation, including all facilities searched pursuant to search warrants and documents obtained through subpoenas; (iv) substantial time reviewing the evidence provided at the AUSAs request, including emails, bank records, subpoena returns, and witness statements, as well as the search warrants and affidavits executed as part of the investigation and DANY's draft prosecution memorandum; and (v) an August 2017 prudential review of classified materials in the possession of certain intelligence agencies. The Government's disclosure obligations were discussed and conveyed to DANY. The initial prosecution team continued to discuss discovery issues as they arose post-charging. Also post-charging, the AUSAs then assigned

---

[11] We did not provide Policy training for any SDNY SAUSAs. As discussed below, we are mandating that all current and future SAUSAs receive such training.

The Honorable Alison J. Nathan  Page 18
July 2, 2020

to the case had conversations with the FBI and DANY about the Government's disclosure obligations and, again, the need to disclose potentially exculpatory materials. This included, among other things, the AUSAs communicating with DANY and the FBI about discovery that needed to be produced and other communications to attempt to ensure that SDNY was in possession of all relevant materials, including witness statements.

**Question 8. (DANY and SDNY Responsive Steps)**
*8. What, if any, steps are being taken by the US Attorney's Office and/or DANY, in response to the handling of this case?*

DANY has informed us that, in response to the issues raised in this case, it is reviewing and updating its protocols for prosecutions conducted jointly with other prosecutors' offices. In particular, DANY has informed us that, in any case where there is a cross-designation of a DANY prosecutor, DANY will take steps to ensure that the principal prosecutor's office will be responsible for assessing and disclosing any materials gathered and supplied by DANY, to avoid any uncertainties that might otherwise result from the joint nature of the prosecution. This will augment the training already conducted by DANY on Brady responsibilities and discovery obligations, including those introduced by New York State in January 2020.

For our part, this Office strives to hold itself to the highest ethical standards and is taking a number of steps to address the issues that emerged in connection with this case. First, we are pursuing a comprehensive internal evaluation of the root causes of the above-described mistakes in our handling of this case, which will continue until we are satisfied that we fully understand the problem. Second, later this month we will be conducting a Criminal Division-wide refresher on our September 2018 discovery Policy training. Third, we will be requiring all future Criminal SAUSAs to undergo that disclosure training as part of their onboarding process and ensuring that all current SAUSAs complete it in the next six weeks. Other measures may suggest themselves during this period. Once we have completed our comprehensive evaluation, we will use what we learn as a basis for revisions of policies, if needed, and for updated training to all Criminal Division AUSAs and SAUSAs.

**Conclusion**

There were many disclosure issues in this case and we have attempted to identify what went wrong in each instance. This Office is and remains committed to providing full and timely disclosure and to identifying as well as possible in our often complex cases areas and items of disclosure, including items wherever we can discern a potential defense theory. This case, and this letter, will serve to illustrate many of the concerns that can arise. But we would again stress that

The Honorable Alison J. Nathan  Page 19
July 2, 2020

we do not believe any issue in this case arose from bad faith or an intentional failure to comply with any disclosure obligation.

          Respectfully submitted,

          AUDREY STRAUSS  
          Acting United States Attorney

by: _____  
          JOHN M. McENANY  
          Associate United States Attorney  
          (212) 637-2571