

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 17, 2021

**BY ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square, Courtroom 906
New York, New York 10007

    Re:    *United States v. Ali Sadr Hashemi Nejad*, 18 Cr. 224 (AJN)

Dear Judge Nathan:

The Government respectfully submits this letter in response to the Court's February 22, 2021, Order (Dkt. 399) (the "February Order"). In particular, this letter provides the Court's requested status report "detail[ing] the Government's efforts to identify any other cases in which similar abuse occurred and to inform the courts and defendants in those cases" and "discuss[ing] any training initiatives or policy changes undertaken to prevent improper use of information loaded into the BIDMAS system." (*Id.* at 19).

After reviewing the February Order, this Office and the FBI determined that a formal audit was the best mechanism for assessing "the FBI's attention to the limits of the Fourth Amendment in its use of the BIDMAS system." (*Id.* at 18). Accordingly, and as described below, the FBI Inspection Division's External Audit and Compliance Section (the "FBI Audit Section") designed and executed such an audit, evaluating BIDMAS users' Fourth Amendment compliance in cases from this district (the "BIDMAS Audit"). The BIDMAS Audit determined that all BIDMAS users' searches were within the scope of the search warrants. Although they did not identify any problems with BIDMAS searches, the audit team also developed eight recommendations to improve the BIDMAS evidence review process and safeguard against inappropriate searches. We outline their recommendations below, along with additional steps this Office and the FBI have taken in response to the Court's concerns, including expanded training and the development of tools to facilitate appropriate review of electronic materials.

**I.  Background**

As part of pre-trial suppression litigation in this case, the assigned AUSAs believed and represented to the Court that email search warrant returns had only been reviewed by Manhattan District Attorney's Office ("DANY") personnel on DANY's review platforms as part of DANY's investigation of state offenses. *See* Dkt. 399, at 16-18; *see also United States v. Nejad*, 436 F. Supp.3d 707, 716 (S.D.N.Y. 2020). Based on those representations, the Court denied much of the

The Honorable Alison J. Nathan                                                                                                Page 2
August 17, 2021

motion to suppress and allowed the Government to rely on materials seized during DANY's search. *See Nejad*, 436 F. Supp.3d at 736-38.

But in July 2020, the Government reported to the Court that it had identified an FBI report and related email traffic with DANY, which showed that DANY had undertaken searches of DANY's email database at the FBI's request during a period when FBI reports stated that the FBI was investigating federal crimes. Dkt. 354 at 5-6; *see also* Dkt. 341, Ex. E at 3 (a copy of a June 2016 FBI report, which states that FBI New York was investigating "violations of IEEPA (Iran Sanctions), Money Laundering, Bank Fraud, Wire Fraud and other violations to be determined"). As the Government recognized in that filing, these materials should have been identified and produced to defense counsel in advance of suppression litigation and such timely disclosure may well have resulted in the Court granting the defense's suppression motion. *See id.* at 7; *see also United States v. Nejad*, 487 F. Supp.3d 206, 210-11 (S.D.N.Y. 2020). Then, on October 30, 2020, the Government advised the Court that the FBI had also uploaded raw search warrant returns in this case to BIDMAS and that FBI personnel had conducted their own review of those returns on that platform before this Office became involved in the case. *See* Dkt. 392, at 2-4. We noted that we did not yet have a complete factual picture, but that "[s]ome of the searches appear to have related to investigations other than that of Sadr" and that what we had seen to that point "suffice[d] to raise substantial concern." *Id.* at 3.

In its February Order, the Court described the foregoing, and expressed its concern "that queries of information in the BIDMAS system may represent a blind spot in the Government's attention to its Fourth Amendment and *Brady* obligations." (Dkt. 399 at 19). Accordingly, it directed the Government to submit this status report, addressing the Government's efforts to ascertain whether similar issues occurred in other cases, and describe training and policy changes undertaken to ensure information loaded into BIDMAS is used properly. (*Id.*).

    **I.**       **The Government's Assessment of the FBI's Use of BIDMAS**

    **A.**  **BIDMAS**

BIDMAS—an acronym for the "the Bureau Investigative Document Management and Analysis System"—is the FBI's proprietary data-review platform, analogous to commercially available interfaces such as Relativity. Technical management and support of the platform is handled by a group within the FBI's Criminal Investigative Division's Economic Crimes Unit (the "BIDMAS Team"). To have a BIDMAS Team member upload data to BIDMAS, an FBI case agent must complete and submit a data submission form that briefly describes the data and identifies, among other things, whether it includes any potentially privileged information that requires filtering.

After the BIDMAS Team has uploaded data to BIDMAS, access to that material is restricted to those BIDMAS Team members involved in the uploading process and members of the case team, as identified by the case agent (potentially privileged materials may be separately restricted to members of so-called "filter" or "taint" teams). BIDMAS automatically creates a review trail recording, among other things, what user accessed the data, when it was accessed, and what search terms were used.

The Honorable Alison J. Nathan                                                                                                    Page 3
August 17, 2021

### B.  The BIDMAS Audit

Following discussions of the February Order with the FBI New York Field Office and the FBI's Inspection Division ("INSD"), this Office and the FBI determined that a formal audit would be the most effective means of assessing whether FBI personnel conducted searches beyond the Fourth Amendment's scope in other prosecutions. The FBI assigned this task to the FBI Audit Section, which regularly audits internal FBI programs. During April and May 2021, the FBI Audit Section personnel assigned to this matter (the "BIDMAS Audit Team") developed an audit plan. When doing so, BIDMAS Audit Team leaders consulted closely with this Office and the FBI's New York Field Office to ensure that the BIDMAS Audit was calibrated to address the February Order's concerns. However, neither this Office's nor FBI New York's personnel were part of the BIDMAS Audit Team, and it was understood that the BIDMAS Audit Team leaders were to resolve all questions as to the audit's scope and conduct.

After considering the number of cases active and accessible in BIDMAS and weighting their selection toward this Office's cases (as most likely to reflect any "similar abuse" to that identified in the February Order), the BIDMAS Audit Team leaders selected a review period of 2017 through 2019,[1] during which timeframe 18 FBI investigations in this district that resulted in prosecution had at least one BIDMAS upload.[2] Those cases involved a total of approximately 139 search warrants, of which 36 had warrant data uploaded to BIDMAS. The BIDMAS Audit focused on FBI personnel's review of these materials. In particular, with respect to FBI personnel's review of those 36 warrant returns, the BIDMAS Audit Team leaders determined that the BIDMAS Audit would focus on identifying any improper or out-of-scope searches on BIDMAS and highlighting potential policy changes to help prevent improper use of materials uploaded to BIDMAS.

Before beginning the audit, the BIDMAS Audit Team leaders also reviewed BIDMAS records for prosecutions in this district between 2015 and 2019 (other than *Sadr*)—a total of 34 cases—to see whether other state search warrant returns had been uploaded to BIDMAS. They determined that no state search warrants were uploaded to BIDMAS in these cases.

The BIDMAS Audit Team conducted the BIDMAS Audit during the last two weeks of July 2021. During that period, five previously selected "Assistant Inspectors in Place" (all of whom are supervisory-level FBI special agents) traveled from various field offices to FBI headquarters in Washington to conduct the BIDMAS Audit. The complete BIDMAS Audit Team also included an FBI section chief and unit chief; a data scientist; four management and program analysts assigned to INSD; an assistant inspector; an attorney assigned to the FBI's Office of the General Counsel; a subject matter expert from the FBI's Office of Integrity and Compliance; and BIDMAS Team members from the Criminal Investigative Division. When conducting the BIDMAS Audit, the BIDMAS Audit Team had access to, among other things, the underlying search warrants for each of the 36 warrant returns; each case's BIDMAS review trail; data in the FBI's electronic case file

---

[1] No prosecutions from this district had search warrant material uploaded to BIDMAS during 2020.

[2] The BIDMAS Audit Team later determined that one of the 18 prosecutions had only uploaded consent search materials to BIDMAS, and that another had withdrawn its BIDMAS submission after determining that it included only images rather than email.

The Honorable Alison J. Nathan                                                                                                  Page 4
August 17, 2021

system for each case; the respective cases' case agents; and other FBI personnel who conducted BIDMAS searches. As part of the BIDMAS Audit, the BIDMAS Audit Team conducted 23 interviews of FBI personnel who conducted queries within BIDMAS to probe how given searches fit within the scope of the warrant.

At the conclusion of the review, the BIDMAS Audit Team assessed that all BIDMAS searches were within the scope of the search warrants.

### C.   Conclusions Regarding the FBI's Use of BIDMAS

The BIDMAS Audit's analysis supports the conclusion that BIDMAS is not a vehicle for misuse of search warrant materials. Instead, comprehensive review of searches across a large sample of cases suggested that those queries were limited by the parameters of the relevant search warrants. Although we discuss the BIDMAS Audit Team's recommendations for BIDMAS improvements below, BIDMAS's combination of strict access controls and a robust review trail has also guarded against the sort of abuses the February Order contemplated.

To be sure, the use of BIDMAS in this case prompted serious concern for this Office as for the Court. (*See* Dkt. 392, at 2-4). However, in light of the BIDMAS Audit's findings, it appears that the FBI's use of BIDMAS here was anomalous in at least two key respects. As noted above, based on the BIDMAS Audit Team's review, other than *Sadr*, no state search warrants were uploaded to BIDMAS in SDNY prosecutions between 2015 and 2019. Moreover, because in *Sadr* the applicable warrants were obtained, the data was uploaded, and the FBI's queries were conducted before this Office became involved in this case, there was also no federal prosecutorial engagement with or supervision of any aspect of the BIDMAS review.

In short, following a formal audit of the FBI's use of BIDMAS in this district's cases, we have not identified abuse of the BIDMAS database that might call for disclosure in other cases.

## II.  The BIDMAS Audit Team's Recommendations and Our Additional Steps

### A.   The BIDMAS Audit Team's Recommendations

Although the BIDMAS Audit did not identify any out-of-scope searches, the BIDMAS Audit Team developed eight recommendations to further safeguard against potential Fourth Amendment violations. These recommendations include:

- requiring that any FBI agent submitting data for upload to the BIDMAS Team provide a copy of the warrant or other legal process through which the FBI obtained the data as part of the data submission form;

- isolating and differentiating within BIDMAS each upload and its corresponding legal authority;[3]

---

[3] The BIDMAS Audit Team observed that all of a particular case's uploaded data was aggregated within BIDMAS, rather than being segregated by warrant. For purposes of the BIDMAS Audit,

The Honorable Alison J. Nathan  Page 5
August 17, 2021

- mandating documentation in the BIDMAS data submission form of any time restriction within which searches need to be completed;

- including a timing mechanism within BIDMAS to restrict access to uploaded material after any applicable time limit has been exceeded;

- expanding the BIDMAS review trail to indicate whether a document identified by a search was in fact opened by the searcher;

- ensuring that all BIDMAS data submissions are documented and included within the FBI's electronic case file;

- requiring agents to document completed BIDMAS searches—including, among other things, the timeframe of the search, the number of items submitted, the search terms used, the number of items searched, and the number of items determined relevant—in the FBI's electronic case file; and

- increasing BIDMAS technical personnel to address these recommendations.

Consistent with FBI audit protocols, the FBI Audit Section will shortly disseminate its report and these recommendations to all relevant FBI stakeholders, including the FBI's Criminal Investigative Division, which manages the BIDMAS Team. The FBI Audit Section will request that the BIDMAS Team implement the recommendations in the next 60 days. The FBI Audit Section will thereafter remain in dialogue with the BIDMAS Team until the FBI Audit Section determines that the recommendations have been satisfactorily implemented.

### B. Additional Steps

In addition to the BIDMAS Audit Team's recommendations (and indeed prior to completion of the BIDMAS Audit), FBI counsel separately made clear to FBI New York personnel that they must contemporaneously document in the case file that anyone for whom they request BIDMAS access has reviewed and is familiar with the search warrants underlying the seizure of uploaded search material.

Further, as the February Order noted, the Government has been working to implement improvements that address the issues that developed in this and other cases. (*See* Dkt. 399, at 18-19; *see also* Dkt. 396 (reporting on initial steps we had taken)). Those efforts have continued and have included additional steps to help ensure that electronic searches are conducted with appropriate attention to Fourth Amendment and *Brady* obligations.

---

the BIDMAS Audit Team correlated the timing and substance of warrants with the timing and substance of queries to assess searches' conformity to the applicable warrants' scope.

The Honorable Alison J. Nathan  Page 6
August 17, 2021

Among other things, over the past ten months, this Office has conducted training for eleven federal agencies and a total of approximately 2,500 law enforcement personnel (including the FBI training referenced in our December 2020 letter). This training has emphasized the importance of conforming all searches to applicable legal requirements—including ensuring that they are conducted on a timely basis and limited to the scope authorized by warrants—as well as the need for clear communication between agents and prosecutors with respect to those requirements. It has similarly underscored the importance of coordination around discovery and disclosure, beginning from the outset of an investigation and continuing until a case has concluded.

This Office's Disclosure Committee[4] has also worked with law enforcement partners, including the FBI, to develop resources to help familiarize AUSAs with each agency's reporting and data management systems, to mitigate the risk of failed or garbled communication around the use of review platforms like BIDMAS. Our expanded requirement of agency file reviews has been similarly helpful in this regard. Finally, we have recently developed and disseminated to all AUSAs updated internal guidance on electronic searches, to help ensure consistent, appropriate attention to the diverse legal and practical issues such searches present, including with respect to warrants' limitations. We expect to reinforce this written guidance in our next round of Office-wide training this fall.

**III.   Conclusion**

The BIDMAS Audit Team's thorough audit concluded that BIDMAS users have complied with their Fourth Amendment obligations. However, we and the FBI have used the lessons of this case to refine and improve our approach to electronic searches and discovery and disclosure practices. We make no complacent assumption that this will eliminate all mistakes and errors of judgment, and we will remain vigilant to ensure that such issues are timely identified and disclosed. But we do have confidence that our ongoing efforts in this area ensure that our enduring commitment to the highest ethical and professional standards translates into all aspects of our casework.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by: _____
JOHN M. McENANY
Associate United States Attorney
(212) 637-2571

---

[4] Since creation of this Office's standing Disclosure Committee last year, *see* Dkt. 396 at 3, FBI New York has also created a disclosure committee with which we meet regularly.